UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\* \* \*

| | |
|---|---|
| SONALOLITA WILSON,<br><br>　　　　　　　　　Plaintiff(s),<br><br>　v.<br><br>UNITED STATES OF AMERICA, et al.,<br><br>　　　　　　　　　Defendant(s). | Case No. 2:18-CV-1241 JCM (NJK)<br><br>FINDINGS OF FACT AND CONCLUSIONS OF LAW |

Presently before the court is the matter of *Wilson v. United States*. This court conducted a four-day bench trial on this matter beginning on July 10, 2023.

Considering the evidence adduced at trial, the court makes the following findings and conclusions. Any and all findings of fact set forth herein shall constitute findings of fact even if stated as conclusions of law, and any and all conclusions of law set forth herein constitute conclusions of law even if stated as findings of fact.

Consistent with those findings and the previous rulings in this matter, the court hereby rules in favor of plaintiff Sonalolita Wilson and against defendant the United States on her remaining negligence claim, and awards damages for medical expenses incurred through April 2017, as set forth below.

**FINDINGS OF FACT**

　　1.　　This is a personal injury action arising from two vehicle accidents on September 1, 2016, involving plaintiff Sonalolita Wilson ("Plaintiff" or "Wilson"), and dismissed defendants Nakia McCloud ("McCloud"), and Liceth Demha-Santiago ("Demha-Santiago").

　　2.　　In 2014, 2015, and 2016, Wilson visited hospital emergency departments with complaints that included pain in her neck, upper back, lower back, right shoulder, and/or

**James C. Mahan**
**U.S. District Judge**

1  headaches. Specifically, an ER visit on February 4, 2015, stated Wilson had a "[h]istory of
2  chronic low back pain."

3      3.    On November 12, 2014, lumbar X-rays from Mountain View Hospital emergency
4  department revealed an anatomically normal spine, normal alignment, and a pars defect at L5.

5      4.    On September 1, 2016, Wilson was driving a Toyota Corolla eastbound on
6  Washington Street towards Saylor Way, in Las Vegas, Nevada, an intersection with no traffic
7  control devices for eastbound and westbound travel.

8      5.    McCloud, a federal employee, was driving a GMC Terrain eastbound on
9  Washington Street.

10      6.    McCloud stated there were no pedestrians in the crosswalk but, instead, were on
11  the corner of the intersection off to her left on the sidewalk.

12      7.    McCloud stated Wilson pumped her brakes, making it appear as though Wilson
13  was not sure whether to stop or continue because of the pedestrians.

14      8.    McCloud's GMC was unable to avoid Wilson because of traffic and struck the
15  rear of Wilson's Toyota.

16      9.    McCloud was not cited for the accident.

17      10.    McCloud was not disciplined for the accident.

18      11.    McCloud did not have to undergo any remedial training because of the accident.

19      12.    Wilson was wearing her seatbelt at the time of impact with McCloud.

20      13.    After the impact, McCloud drove her GMC to the south side of eastbound
21  Washington Street to remove it from the path of eastbound traffic and called 911.

22      14.    Wilson got out of her Toyota and walked around it to inspect for damage.

23      15.    McCloud testified that, during this time, she did not see any signs of injury to
24  Wilson, nor did Wilson display any issues with walking.

25      16.    Wilson returned to her Toyota and sat in it.

26      17.    Wilson did not fasten her seatbelt when she got back in her Toyota.

27      18.    Wilson did not drive her Toyota to the side of eastbound Washington Street or
28  otherwise remove it from the path of oncoming traffic.

**James C. Mahan**
**U.S. District Judge**

19. Wilson did not turn on her Toyota's hazard lights.

20. Ms. Wilson testified that the Toyota was disabled, but in discovery, she did not make the vehicle available to the United States for inspection to confirm the vehicle's condition.

21. Liceth Demha-Santiago ("Demha-Santiago") was driving her parents' Acura TL eastbound on Washington Street.

22. As Demha-Santiago approached the intersection of Saylor Way, she noticed the activated brake lights of Wilson's Toyota.

23. Demha-Santiago did not see hazard lights on Wilson's Toyota.

24. Demha-Santiago applied her brakes, but her Acura still struck the rear of Wilson's Toyota.

25. Accident reconstructionist Sam Terry inspected McCloud's GMC and its databox recorder.

26. Wilson was either at a stop or travelling between 10.3 and 14.1 mph at the intersection when she was rear-ended by McCloud.

27. Terry did not inspect Wilson's Toyota because it was not preserved for inspection.

28. Terry did not inspect Demha-Santiago's Acura because it was not preserved for inspection.

29. An eyewitness, Calvin Akyes, called 911 to report the first accident at 4:24:54 p.m.

30. McCloud called 911 at 4:26:09 p.m., and the second accident occurred while she was on the call with the operator.

31. Mr. Akyes called 911 again when the second accident occurred at 4:28:36 p.m.—less than four minutes later.

32. When paramedics arrived at the accident scene, Wilson complained of pain in the left side of her neck, face, and right knee. Wilson denied loss of consciousness, chest pain, abdominal pain, back pain, nausea or vomiting. Paramedics transported Wilson to the University Medical Center ("UMC") emergency department.

**James C. Mahan**
**U.S. District Judge**

33. At UMC, a CT scan of Wilson's brain was negative for trauma, and a CT scan of Wilson's neck was negative for acute fractures or malalignment. UMC found no loose teeth or oral trauma. UMC diagnosed Wilson with a left maxillary sinus fracture, a laceration to her left cheek, and muscle spasms of the cervical muscles of the neck.

34. The hospital emergency department discharged Wilson the same day with a recommendation to follow up with a plastic surgeon for her facial injury.

35. UMC did not recommend that Wilson follow up with an orthopedic doctor, a neurosurgeon, an oral maxillofacial surgeon, or a dentist.

36. At UMC, Wilson was treated with only two sutures and a lidocaine injection into her left cheek for the laceration,.

37. At UMC, Wilson had no complaints of back pain, no complaints of extremity pain, and no complaints of numbness or tingling.

38. At UMC, Wilson told the doctors the rear-end hits took place within 20 seconds of each other.

39. Approximately one week later, Wilson saw Dr. Jaswinder Grover, an orthopedic surgeon. Dr. Grover diagnosed Wilson with cervical, thoracic, and lumbar sprains/strains, and recommended MRIs of the thoracic and cervical spine and physical therapy. Dr. Grover referred Wilson to physical therapy.

40. Dr. Lowe, the United States' expert, stated Dr. Grover's recommendation for cervical and thoracic MRIs on September 8, 2016, were not medically necessary because there were no neurologic symptoms on exam.

41. On September 9, 2016, Better Back Physical Therapy recommended a plan of conservative care for Wilson for six weeks, twice a week.

42. Wilson had an MRI of her cervical spine on September 15, 2016. The radiologist's impressions of the September 15, 2016, MRI of Wilson's cervical spine were no evidence of herniation or spinal stenosis, mild annular bulge at C5-6, intact appearance of the cervical spinal cord, loss of the normal cervical lordosis (which may be due to position or

**James C. Mahan**
**U.S. District Judge**

- 4 -

spasm), and no bone or bone marrow abnormalities. Dr. Lowe explained that this cervical MRI was normal.

43. On October 5, 2016, at Better Back Physical Therapy, the physical therapist noted that Wilson shared concerns of not being able to complete work duties due to pain and of the possibility to go onto disability.

44. On October 6, 2016, at Better Back Physical Therapy, the physical therapist noted that Wilson continued to present to Physical Therapy in 6-inch high heels.

45. On October 10, 2016, Wilson saw Dr. Ghuman, a pain management doctor in the same practice group (Nevada Spine Clinic) as Dr. Grover. Dr. Ghuman ordered MRIs of the cervical and lumbar spine. Dr. Ghuman also prescribed several medications, including Norco, an opioid-based pain medication.

46. On October 18, 2016, at Better Back Physical Therapy, the physical therapist noted that "[p]atient's pain and symptoms are inconsistent per the physical therapist."

47. Wilson had a lumbar spine MRI on November 29, 2016. The radiologist's impressions of the November 29, 2016, MRI of Wilson's lumbar spine included straightening of the normal lumbar lordosis (which may be positional or related to muscle spasm), no fractures, no posterior disc bulge, no disc protrusion, no spinal canal stenosis, no neural foraminal narrowing, and the developmental occult dysraphic defect within the posterior elements of L5 with partial underdevelopment of the right L5-S1 facet joint (an incidental and congenital finding).

48. Dr. Lowe testified that there was no evidence of nerve impingement on the lumbar spine MRI on November 29, 2016.

49. Dr. Lowe testified that none of the findings on the November 29, 2016, MRI were indications for either a discogram or lumbar fusion surgery.

50. Wilson's last physical therapy visit in 2016 was on December 2, 2016.

51. Wilson's last appointment with Nevada Spine Clinic in 2016 was on December 5, 2016.

**James C. Mahan**
**U.S. District Judge**

52. By December 5, 2016, more than 90 days after the accident, there had been no impression from a CT scan or MRI, nor had there been diagnosis, of a cervical or lumbar spinal nerve impingement.

53. On January 11, 2017, Dr. Glyman, a maxillofacial surgeon, performed a reduction of nasal fracture and septoplasty on Wilson.

54. Wilson did not visit any doctors or physical therapists for consults, treatment, or diagnostic studies related to headaches, neck pain, or back pain for a significant seven-month gap, between December 5, 2016, and July 7, 2017.

55. Wilson's last appointment with any treatment provider was a follow-up with Dr. Glyman on April 7, 2017, and she did not return to the Nevada Spine Clinic until July 7, 2017, a three-month gap.

56. On July 7, 2017, Wilson saw Dr. Ghuman, who performed a greater occipital nerve block injection, and directed Wilson to proceed with cervical transforaminal epidural steroid injections, cervical trigger point injections, and an L5 selective nerve root block injection.

57. Dr. Chavez, the United States' expert, testified that none of the pain management modalities provided to Wilson on July 7, 2017, were medically necessary.

58. For at least the next one and one-half years, Wilson received varying types of injections in her cervical and lumbar spinal area from Nevada Spine Clinic. Dr. Ghuman also regularly prescribed Norco and other opioids.

59. Before January 10, 2019, Dr. Chavez testified that there was never an indication for an epidural steroid injection or selective nerve root block, as there was never any evidence of nerve impingement for Wilson.

60. Wilson had a lumbar spine MRI on November 30, 2017. The radiologist's impressions of the November 30, 2017, MRI of Wilson's lumbar spine were a L5-S1 mild central disc bulge without spinal canal or neural foraminal stenosis. Stable occult dysraphic defect is again seen within the posterior elements of L5 with partial underdevelopment of the right facet joint, L4-S5 mild central disc bulge without spinal canal or neural foraminal stenosis.

61. Dr. Lowe testified that none of the findings on the November 30, 2017, lumbar spine MRI were indications for either a discogram or lumbar fusion surgery.

62. Dr. Lowe testified that the November 30, 2017, lumbar spine MRI showed an anatomically normal spine on Wilson. Specifically, that there were no herniations, her discs were normal at all levels, and, just had been the case a year prior, there remained no evidence of nerve root compression on Wilson.

63. Dr. Lowe explained the November 29, 2016, lumbar spine and November 30, 2017, lumbar spine MRI demonstrated that there was nothing to be offered Wilson surgically.

64. On orders of Dr. Grover, Dr. Ghuman performed a lumbar discogram on Wilson on December 6, 2017. Dr. Lowe and Dr. Chavez testified that a discogram is a controversial test in which dye is injected into one or more spinal discs to provoke pain. Dr. Lowe and Dr. Chavez further testified that the lumbar discogram was medically unnecessary.

65. With the discogram, Dr. Ghuman noted non-concordant pain at L2-3, no pain at L3-4, concordant pain at L4-5, and "10/10 equivocal pain" at L5-S1.

66. Dr. Chavez testified that the discogram failed to note how many opioids Wilson was taking at the time.

67. The discogram started at a level of 8 out of 10 pain which, per Dr. Chavez, cannot be the baseline.

68. Both Dr. Chavez and Dr. Lowe testified about the unreliability of the discogram conducted.

69. Dr. Chavez and Dr. Lowe testified one does not proceed to recommending a lumbar fusion surgery with normal MRIs and an "abnormal" discogram.

70. On the same day as the discogram, a post-discography CT was conducted, demonstrating that on the "L5-S1: there is a right L5-S1 pars defect. No spondylolisthesis. Most of the intradiscal contrast is located anteriorly. There is a right posterior lateral grade 3 tear."

71. Dr. Lowe testified there is some question as to whether the Grade III tear was even present on the post-discogram CT, or was rather a Grade II tear, or was not even a tear at all. Notably, a Grade III tear is often asymptomatic, caused by normal wear and tear or

1  degeneration, and most importantly, is not an indication for lumbar fusion surgery in the face of
2  a patient's normal MRIs of the lumbar spine.

3  72. Dr. Lowe and Dr. Chavez explained that an annular tear alone does not denote
4  pain and explained the necessity to localize a pain generator, which was never present in the
5  medical records.

6  73. On December 20-21, 2017, Wilson visited Valley Hospital's emergency
7  department with complaints of headaches. She was diagnosed with migraine, given education
8  instruction materials on "headache, unspecified; headache, analgesic rebound (medication-
9  overuse headache)," and directed to follow up with Gregory Douds, SUR. There is no record of
10 Wilson following up with Douds.

11 74. On January 23, 2018, Dr. Grover at the Nevada Spine Clinic states "[t]he patient
12 has been counseled as it relates to consideration of surgical treatment through reconstruction and
13 stabilization of L4 to S1," not mentioning the L5 level.

14 75. On February 21, 2018, Wilson saw neurologist Dr. Milford for EMG and NCS
15 tests. The impressions were as follows: Bilateral L4-5 radiculopathy, acute-on-chronic; and no
16 convincing electrodiagnostic evidence for polyneuropathy, plexopathy, mononeuropathy or
17 myopathy.

18 76. On March 15, 2018, upon referral of her attorneys, Wilson saw Dr. Dunn, an
19 orthopedic surgeon, for a "second opinion" about lumbar fusion surgery.

20 77. Dr. Lowe testified that Dr. Dunn conducted a lacking "second opinion,"
21 indicating that Dr. Dunn reviewed only the November 29, 2016, MRI report (failing to review
22 the images of either the November 29, 2016, or November 29 and 30, 2017, MRIs, and not
23 reviewing the November 2017 MRI report), the discogram and its results, and only one note
24 from the Nevada Spine Clinic, September 27, 2017, where Wilson underwent a medically
25 unnecessary left L5 selective nerve root block.

26 78. Dr. Dunn did not review any diagnostic imaging of Wilson performed before
27 September 1, 2016.

28 79. Dr. Dunn did not document any chronic opioids that Plaintiff was taking.

**James C. Mahan**
**U.S. District Judge**

80. Upon examining Wilson, Dr. Dunn ruled out any neurological problem. At trial, Dr. Dunn admitted a discogram ought not be used as a screening test. Further, Dr. Dunn advised that surgery should be an option of last resort for lumbar back pain.

81. Upon referral by Dr. Grover, Wilson visited the psychological services office of Louis Mortillaro, Ph.D. on November 14, 2018. A November 18, 2018, report by Janet Bauman, Ph.D. recommended, among other things, 12 sessions each of cognitive behavioral therapy and biofeedback therapy. At this meeting Wilson "specifically reported fear of being a passenger or driver and indicated that she at times has panic attacks." There is no record of any follow-up with this provider or any other behavioral specialist.

82. Wilson admits to driving in 2017 and 2018. Wilson was a passenger in a vehicle for three separate motor vehicle accidents that occurred on December 26, 2019, March 3, 2020, and March 15, 2020

83. Wilson admits to dancing in 2017 and 2018.

84. Wilson is not currently treating with a psychotherapist, behavioral therapist, or psychiatrist for her alleged disorders.

85. On December 5, 2018, despite Wilson not recalling this visit at trial, Wilson saw a Dr. Franz, specialist in pain addiction, where she recounted being hospitalized 24 hours after the accident.

86. Dr. Lowe testified that on January 10, 2019, Dr. Grover performed a medically unnecessary L4-S1 decompression and instrumented fusion with an interbody graft placed at L5-S1 ("lumbar fusion surgery").

87. Weeks later, Wilson developed a wound infection that required Dr. Grover to perform a debridement procedure, a complication stemming from the unnecessary January 10, 2019, surgery.

88. Over the next three months, Wilson returned to Dr. Grover's office for multiple post-operative follow-up visits. On April 26, 2019, Wilson saw Dr. Grover with complaints of severe radiating back pain into her leg. X-rays revealed a "posterior migration of interbody graft

on the right side." This complication stemmed from the unnecessary January 10, 2019, surgery according to Dr. Lowe.

89. On May 2, 2019, Dr. Grover performed a posterior re-exploration laminectomy at L5-S1, removed the instrumentation from the prior fusion, and re-implanted the L5-S1 interbody graft with re-instrumentation stabilization. Later that day, Wilson went to the emergency room at Mountain View Hospital with complaints of lower back pain and pain radiating down her right leg. These complications stemmed from the unnecessary January 10, 2019, surgery according to Dr. Lowe.

90. Days later, Wilson went to the emergency room at Summerlin Hospital Medical Center with complaints of intractable back pain and lower back spasms. There, a CT scan revealed significant compression of the nerves from her displaced interbody device. This is the first time Wilson ever showed evidence of any nerve compression in her spine. These complications stemmed from the January 10, 2019, surgery according to Dr. Lowe.

91. On May 15, 2019, Dr. Grover performed an anterior lumbar interbody instrumented fusion of L4-5 and L5-S1 after removal of the retropulsed interbody prosthesis of L5-S1 via the anterior approach ("anterior revision surgery"). In other words, Dr. Grover removed the fusion hardware through Wilson's abdomen (rather than her back) and then inserted a new interbody cage.

92. Following the anterior revision surgery, Wilson went to Kindred Transitional Rehabilitation Center for rehabilitative therapy.

93. All these complications stemmed from the unnecessary January 10, 2019, surgery according to Dr. Lowe.

94. Following the 2019 lower back surgeries, Wilson has experienced several neurologic problems and symptoms, such as Cauda Equina Syndrome ("CES") and foot drop, that did not exist between September 1, 2016, and January 10, 2019.

95. Dr. Lowe testified to and explained that the January 10, 2019, surgery was medically unnecessary and, thus, not causally related to the September 1, 2016, motor vehicle accidents.

James C. Mahan
U.S. District Judge

96. Further, the complications that unnecessary procedure caused, including the revision surgeries, rehabilitation, more physical therapy, and Wilson's current treatment, from January 10, 2019, onward, are also not causally related to the September 1, 2016, motor vehicle accidents.

97. All of Wilson's current neurologic deficits were caused by the medically unnecessary procedure on January 10, 2019.

98. Dr. Chavez testified at trial for defendant and opined that Dr. Ghuman did not commit medical malpractice.

99. Dr. Lowe testified at trial for defendant and opined that Dr. Grover did not commit medical malpractice.

100. Before and after the September 1, 2016, car accidents, Wilson worked intermittently through temporary placement agencies, including working as a forklift driver, warehouse worker, and hotel housekeeper.

101. Wilson continued to work after the accident in 2017, 2018, and in 2019.

102. Wilson sustained the following injuries from the September 1, 2016, car accidents:

    (1) Left-sided facial contusion with small left cheek laceration;

    (2) Right knee contusion / sprain / strain with no internal derangement injury;

    (3) Left maxillary anterior wall fracture;

    (4) Cervicothoracic spine myofascial sprain / strain; and

    (5) Lumbar spine myofascial sprain / strain

103. Between September 1, 2016, and January 10, 2019, there was no evidence that Wilson had sustained a structural or motion segment lumbar spine injury. Between September 1, 2016, and January 10, 2019, there was no evidence of a discogenic injury.

104. The following medical visits (including exams, treatments, and diagnostic studies) and expenses were reasonable and necessary due to the September 1, 2016, car accidents:

    (1) those of the paramedics and UMC emergency department on September 1, 2016, totaling $35,757.12;

(2) the visits to the Nevada Spine Clinic (Dr. Grover, Dr. Ghuman, and colleagues) in 2016, except for visits for Dr. Ghuman's IV push medication treatments, totaling $5,051.25;

(3) Medical imaging and radiology from American Radiology, Desert Radiologists, Desert Orthopaedic Center, and Pueblo Medical Imaging prior to April 2017, totaling $6,297.26;

(4) the 2016 Better Back Physical Therapy sessions that ended in December 2016, totaling $6,514.00;

(5) the 2016–2017 visits and treatment with Dr. Glyman, maxillofacial surgeon, totaling $4,950.60.

105. The following medical visits (including exams, treatments, and diagnostic studies) and dental treatment were medically unnecessary and not reasonable as a result of the September 1, 2016, car accidents: all medical visits in and after July 2017 including numerous and varying injections by Dr. Ghuman and the several lumbar surgeries by Dr. Grover, specifically: 7/7/17; 8/8/17; 9/11/17; 9/13/17; 9/27/17; 10/4/17; 10/6/17; 12/6/17 (the date of discogram and post-discography CT); 12/7/17; 1/3/18; 1/23/18; 1/24/18; 2/8/18; 2/19/18; 2/27/18; 3/27/18; 3/27/18; 4/30/18; 6/14/18; 8/29/18; and 9/21; and 1/10/19 and all other treatment of Wilson thereafter.

106. Dr. Chavez testified that dates 5/31/18 (recommendation of psychological evaluation); 8/23/18 (no injections given) and 10/29/18 (no injections given) were reasonable because no injections were given to Wilson. However, those dates stem from the initial unreasonable treatment at Nevada Spine Clinic from 7/17/17 to present and thus were unnecessary as it relates to the accident.

107. Correspondingly, the court finds that no future medical treatment and expenses are reasonably certain to be incurred as a result of injuries sustained in the car accidents of September 1, 2016.

108. Reasonable and necessary past medical expenses as a result of the September 1, 2016, car accidents total $58,570.23.

109. The court declines to award noneconomic damages for pain and suffering because plaintiff has not provided a reasonable method of calculating those damages.

110. The court does not award damages for diminished earning capacity because any diminished earning capacity is attributable to the lumbar surgeries that began in January 2019, not the car accidents of September 1, 2016. Further, there is no dispute that Wilson was working in 2017, 2018, and even up to April 2019.

111. The court finds that Wilson was not comparatively negligent in the accidents.

**CONCLUSIONS OF LAW**

1. Under the Federal Tort Claims Act, 28 U.S.C. §§ 1346(b)(1), 1402(b), 2401(b), 2402, 2671-2680 ("FTCA"), the court has subject matter jurisdiction over Wilson's negligence claim against the United States.

2. Subject to certain exceptions and conditions, the FTCA waives the United States' sovereign immunity such that the United States may be held liable for the negligence of its employees in the same manner and to the same extent as a private individual under like circumstances, according to the law of the state where the act or omission occurred. *See Louie v. United States*, 776 F.2d 819, 824 (9th Cir. 1985); 28 U.S.C. §§ 1346(b)(1), 2674.

3. Nevada law applies to Wilson's negligence claim.

4. A plaintiff must establish four elements to succeed on a negligence claim: (1) a duty of care, (2) a breach of that duty, (3) causation, and (4) damages. *Turner v. Mandalay Sport Entm't*, 180 P.3d 1172, 1175 (Nev. 2008).

5. Before trial, the court ruled the United States may amend its answer to include comparative negligence as a defense (ECF Nos. 191; 192); *see also* NRS 41.141 (comparative negligence statute).

6. This court previously determined that Wilson has no comparative negligence in the first accident with Nakia McCloud/USA and granted summary judgment accordingly. *See* (ECF No. 113).

7. Likewise, the United States failed to offer any credible evidence of Wilson's comparative negligence in the second collision.

8. The United States is jointly liable for both car accidents on September 1, 2016. *See* NRS 41.141; Nev. J.I. 4.6.

James C. Mahan
U.S. District Judge

- 13 -

9. Prior to trial, the court granted Demha-Santiago's motion for a determination that a settlement in the amount of her policy limits, $25,000, was in good faith. *See* Order, ECF No. 159. This amount will be deducted from any award to Wilson against the United States. *See The Doctors Co. v. Vincent*, 98 P.3d 681, 690 & n.31 (Nev. 2004); NRS 17.245.

10. To establish proximate causation, the injury must appear to be the natural and probable consequence of the negligence, and it ought to have been foreseen in light of the attending circumstances. *Yamaha Motor Co. v. Arnoult*, 955 P.2d 661, 664 (Nev. 1998).

11. "[T]he burden of establishing damages lies on the injured party." *Central Bit Supply v. Waldrop Drilling & Pump*, 717 P.2d 35, 37 (Nev. 1986) (citing *Dinwiddie Constr. Co. v. Campbell*, 406 P.2d 294 (Nev. 1965)).

12. To recover for medical expenses and treatment, a plaintiff must prove that the expenses and treatments were "reasonable and necessary" as a result of the defendant's tortious conduct. *Wilson v. Biomat USA, Inc*., No.: 2:10-cv-1657-GMN-RJJ, 2011 WL 5239236, at *3 (D. Nev. Oct. 31, 2011) (citing *Hall v. SSF, Inc*., 930 P.2d 94, 97 (Nev. 1996)). This is because a negligent defendant is, of course, not automatically liable for every future expense incurred by a plaintiff, but only for those that are the "natural and probable consequence" of the defendant's tortious conduct, *Id*. (citing *Hall*, 930 P.2d at 97).

13. Plaintiff has a duty to exercise reasonable care required to promote recovery. *Automatic Merchandisers, Inc. v. Ward*, 646 P.2d 553, 554 (Nev. 1982). Plaintiff is bound to exercise diligence to avoid loss and minimize damages. *Silver State Disposal v. Shelley*, 774 P.2d 1044 (Nev. 1989). The doctrine of mitigation of damages has been applied to preclude recovery for disability which could have been avoided if the plaintiff had exercised reasonable diligence in seeking medical care, including surgical treatment." *Automatic Merchandisers*, 646 P.2d at 554.

14. Although a plaintiff could, testify to the pain from an immediate blow to the head because it was within common lay knowledge, a plaintiff may need expert medical testimony to link subsequent treatments to the accident. *See Beard v. K-Mart Corp.*, 12 P.3d 1015, 1019-21 (Utah Ct. App. 2000); *see also State v. Card*, 190 P.3d 930, 934 (Idaho Ct. App. 2008) (as the claimed symptoms and treatment become more separated in time from the fall, the causal

**James C. Mahan**
**U.S. District Judge**

- 14 -

relationship becomes more doubtful and tenuous, and expert testimony becomes necessary to establish causation). Furthermore, preexisting conditions complicate the question of causation. *See Hare v. Wendler*, 949 P.2d 1141, 1148 (Kan. 1997); *see also Neiberger v. FedEx Ground Package System, Inc.*, 566 F.3d 1184, 1193 (10th Cir. 2009) (holding that plaintiff was not competent to testify to her treatment being caused by the accident as opposed to her preexisting conditions); *Card*, 190 P.3d at 934 ("As time passes, the possibility that prior or subsequent injuries or unrelated disease processes may play a causal role makes lay opinion unreliable and inadequate to sustain a claim."). If there is no medical expert testimony stated to a reasonable degree of medical certainty, then there is nothing on which the trier of fact can rely. *See Neal-Lomax v. Las Vegas Metro. Police Dept.*, 574 F. Supp. 2d 1193, 1198 (D. Nev. 2008) (citing *Morsicato v. Sav-On Drug Stores, Inc.*, 111 P.3d 1112, 1116) (Nev. 2005)).

15. A plaintiff must present "sufficient and competent evidence" to support an award of future medical expenses that are "reasonably certain to be incurred" as a result of the subject incident. *Wilson*, 2011 WL 5239236, at *3 (citations omitted).

16. Given both Wilson's $58,570.23 in reasonable and necessary past medical expenses and the $25,000 good faith settlement by dismissed defendant Demha-Santiago, the United States remains liable for $33,570.23.

Accordingly,

IT IS HEREBY ORDERED, ADJUDGED, and DECREED that, consistent with these findings and conclusions, judgement shall be entered in favor of plaintiff on her negligence claim.

IT IS FURTHER ORDERED that plaintiff shall prepare and file a proposed judgment consistent with the forgoing findings and conclusions within seven (7) days of the issuance of this order.

DATED July 26, 2023.

_____
UNITED STATES DISTRICT JUDGE

**James C. Mahan**
**U.S. District Judge**